## Kerper v. Educators Mutual Life Insurance Company

414

C.P. of Berks County, no. 99-8259.

*Brett A. Huckabee,* for plaintiff.
*George C. Werner,* for defendant.

SCHMEHL, J.L., *J.,* December 10, 2004—The plaintiff, William W. Kerper, is an insured under a policy is-

sued by the defendant, Educators Mutual Life Insurance Company, through plaintiff's former employer, Reinsel & Company. The policy provides for payment of monthly benefits in the event of the insured's disability. In 1995, Mr. Kerper suffered two serious injuries. He continued to work on a part-time, sporadic basis until the pain from his injuries compelled him to leave employment with Reinsel. At the beginning of 1997, he filed a claim with Educators. Disability payments were made from April of 1997 through April of 1999. However, in May of 1999, Educators sent Mr. Kerper a letter, advising him that his benefit eligibility had terminated because they were of the opinion that he suffered only from a mental illness and not from any physical disability.

The plaintiff subsequently instituted the instant action under the Employee Retirement Security Act of 1974 (ERISA), asserting that Educators breached its duty to pay benefits. Specifically, he alleged that the insurance policy entitles him to monthly benefits of $7,000 per month, less Social Security disability payments of $1,298, until April 2012, plus statutory attorneys fees.

A non-jury trial was held before this court on June 24, 2004. On July 6, 2004, this court issued a verdict in favor of the plaintiff and against the defendant in the total amount of $353,524 ($5,702 times 62 months). Both parties then filed post-trial motions, with Educators seeking a judgment n.o.v. or, in the alternative, a new trial, and Kerper arguing that the verdict should have included interest at the legal rate. On October 1, 2004, this court issued an order denying both parties' post-trial motions. On October 18, 2004, Educators appealed this order to the Superior Court.

In accordance with Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure, this court ordered the defendant to file a concise statement of matters complained of on appeal. On November 4, 2004, the defendant filed this statement, alleging the following:

(1) The trial court erred in treating the benefits claim of William W. Kerper, made under an employee benefit welfare plan, as a claim for breach of contract, as his claim was one for benefits under ERISA, permitting only a judicial review of the plan administrator's benefits decision.

(2) The trial court erred in failing to treat Kerper's claim for benefits, made under an employee welfare benefit plan, as permitting only a judicial review of the plan administrator's benefits decision under the arbitrary and capricious standard.

(3) In the alternative, the trial court erred in failing to treat Kerper's claim for benefits, made under an employee welfare benefit plan, as permitting only a judicial review of the plan administrator's benefits decision under a heightened scrutiny/arbitrary and capricious standard.

(4) The trial court erred in failing to treat Kerper's claim for benefits, made under an employee welfare benefit plan, as permitting only a judicial review of the plan administrator's benefits decision and limited to the administrative record as it existed when the plan administrator made [his] decision.

(5) The trial court erred in awarding a verdict on Kerper's claim for benefits, made under an employee benefit welfare plan, by considering testimony or other evidence from a treating physician regarding his opin-

ions based on treatment beginning in 2002, when the trial court's role was limited to a judicial review of the benefits decision made in 1999.

(6) The trial court erred in awarding a verdict on Kerper's claim for benefits, made under an employee benefit welfare plan, by utilizing a standard of judicial review other than whether the plan administrator's benefits decision was without reason, unsupported by substantial evidence and/or erroneous as a matter of law.

(7) The trial court erred in failing to grant Educators' post-trial motions, and specifically by failing to find there was insufficient evidence to support the verdict following the trial in this matter, since the trial court's verdict in effect overruled the plan administrator's benefits decision which should have been accorded deference.

(8) The trial court erred in failing to grant Educators' post-trial motions, and specifically by failing to grant Educators a judgment n.o.v. since, under the arbitrary and capricious standard of judicial review, insufficient evidence was produced by Kerper to overrule the plan administrator's benefits decision.

(9) The trial court erred in failing to grant Educators' post-trial motions, and specifically failing to award Educators a new trial, since, under the arbitrary and capricious standard of review, insufficient evidence was produced by Kerper to overrule the plan administrator's benefits decision.

(10) The trial court erred in failing to grant Educators' post-trial motions, and specifically by failing to award Educators a new trial, where the trial court improperly allowed the admissions of, and improperly considered

the testimony of, Dr. Gould, whose testimony was completely irrelevant to and not admissible on the question of whether the plan administrator's benefits decision made in 1999 should have been overruled.

This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure and for the following reasons, this court asks that the instant appeal be denied.

## THE COURT DID NOT ERR IN RENDERING A VERDICT IN FAVOR OF THE INSURED

The standard of review following a non-jury trial is as follows:

"In our review on this case, we must be mindful that findings of a trial judge in a non-jury case must be accorded the same weight and effect on appeal as the verdict of a jury, and will not be reversed in the absence of an abuse of discretion or a finding of a lack of evidentiary support. *Firestone v. Luther Ford Sales Inc.,* 271 Pa. Super. 480, 414 A.2d 355 (1979). The appellate court, in these circumstances, is limited to determinations of whether the trial court's findings are supported by competent evidence and whether the trial court committed an error of law. *Metz Contracting Inc. v. Boxer Heights Inc.,* 261 Pa. Super. 177, 395 A.2d 1373 (1978). It is also clear that, in reviewing the findings of the trial judge, the victorious party is entitled to have the evidence viewed in the light most favorable to him and all the evidence and proper inferences favorable to the successful party must be taken as true and all unfavorable inferences rejected. *Courts v. Campbell,* 245 Pa. Super. 326, 369 A.2d 425 (1976); *Colish v. Goldstein,* 196 Pa. Su-

per. 188, 173 A.2d 749 (1961). This is especially true where the credibility of witnesses had to be weighed by the lower court. *Brentwater Homes Inc. v. Weibley,* 471 Pa. 17, 369 A.2d 1172 (1977)." *Brenna v. Nationwide Insurance Co.,* 294 Pa. Super. 564, 567-68, 440 A.2d 609, 611 (1982).

The evidence at trial revealed the following. In 1979, Reinsel and Company, a Reading-based accounting firm, hired William W. Kerper CPA as a staff accountant. In the mid-1980s, he rose to the position of partner in charge, supervising the audit department and credit union business. As part of his duties, he evaluated employees and reviewed financial statements and management letters. This required Mr. Kerper to spend more than half of his working hours traveling to Philadelphia, Allentown, and their surrounding suburbs. During this time, he also conducted seminars on behalf of the Pennsylvania Institute of CPAs. His workdays usually began early in the morning and ended late at night.

In July of 1995, Mr. Kerper had a slip and fall accident at the Fairgrounds Square Mall in Reading. Later that same year, on December 5, 1995, he was severely injured in an automobile accident. After both of these accidents, Mr. Kerper experienced daily symptoms of lower back pain, right sciatic pain, and buttock pain. The pain frequently becomes unbearable, causing him to lie down. He also experiences a burning and tingling sensation in his feet and knees. He has a similar sensation, albeit to a lesser degree, in his hands and wrists. Finally, he gets at least two migraine headaches each week, the duration of which varies anywhere from a couple of hours to over a day.

To help alleviate these symptoms, Mr. Kerper takes Neurontin and Trileptal on a daily basis. Both of these medications leave him feeling drowsy and lethargic. In addition, he takes Imitrix for his migraine headaches on an as needed basis.

Mr. Kerper's injuries have significantly affected his daily activities. He is no longer able to drive on a regular basis. However, he does occasionally use his car to drive down his own lane to pick up his mail. He drives on public roads only once or twice a year. He also has problems using the toilet and shaving because of his problems with his hands. He now has a beard. If he is having a "good day," in terms of his pain, he arises early in the morning, does some exercises, helps his wife with some light household chores, and does some paperwork. The rest of his time is spent trying to relax to alleviate his symptoms.

The injuries have had an impact on his mental functioning as his ability to concentrate is now limited. Also, when he worked as an accountant, Mr. Kerper's memory was sharp. Today, he has difficulty remembering names and numbers.

Mr. Kerper has been treated by a number of doctors, including, but not limited to, the following: Dr. Strobel (a pain management specialist), Dr. Gould (a neurologist and sleep disorder specialist), Dr. Wirth (family physician), Dr. Craig Johnson (a neurosurgeon), Dr. Maragakis (a neurologist), Dr. Asbury (a neurologist), and Dr. Kaufman (a podiatrist). These doctors have submitted numerous written reports to Educators concerning Mr. Kerper's diagnosis, prognosis, and treatment. All

of these reports indicate that he suffers from painful physical limitations. (See plaintiff's exhibit no. 5.)

The court viewed the videotaped deposition of Dr. Gould, a neurologist and sleep disorder specialist. He began treating Mr. Kerper in July 2002 and has seen him several times after that. After all of these visits and after reviewing the medical records of other treating physicians, Dr. Gould diagnosed Mr. Kerper with peripheral neuropathy due to monoclonogamopathy. According to Dr. Gould, neuropathy is a disease of the nerves—not a psychiatric illness. To treat the neuropathy, Dr. Gould recommended altering the pain medication and treating the abnormal protein level in Mr. Kerper's blood. Finally, Dr. Gould concluded that Mr. Kerper is physically disabled.

The plaintiff's wife, Janice Kerper, also testified. In addition to corroborating Mr. Kerper's testimony, she noted that his physical injuries have diminished his ability to communicate and interact with others.

The defendant's witnesses consisted of Ken Wasnock, a life and disability claim manager employed by Educators, and Dr. Stephen Katz, the insurance company's independent medical examiner. Mr. Wasnock testified that the insurance policy contained a mental illness/drug and alcohol limitation. According to Mr. Wasnock, this provision limits disability payment to 24 months when the disability results from mental illness conditions. Mental illness is defined in the policy as "mental, nervous or emotional diseases or disorders of any type without demonstrable organic origin." See defendant's exhibit no. 5.

Mr. Wasnock defended his decision to terminate Mr. Kerper's benefits, claiming that the "reports from mul-

tiple physicians were concluding that . . . there was a pain disorder . . . but that the physical findings did not correlate with the physical examinations" and that Mr. Kerper's problems really stemmed from a "psychological overlay." (N.T. 6/24/2004 pp. 22-23.) While Mr. Wasnock claimed to have reviewed the reports of several of Mr. Kerper's treating physicians (*i.e.,* Dr. Johnson, Dr. Brockman, and Dr. Strobel), he failed to indicate with any specificity where these doctor reports agree with his conclusion that there is a "psychological overlay."[1] However, in an effort to bolster his termination decision, Mr. Wasnock testified that he hired a psychologist, Louis Poloni Ph.D., to evaluate Mr. Kerper. He also sent Mr. Kerper's various medical records to a physician, Wilhelmina C. Korevaar M.D., and also to a peer review organization, US Medical Review. Finally, Mr. Wasnock sent Mr. Kerper to an independent medical evaluation performed by Richard I. Katz M.D.

This court reviewed the reports of these various experts and also the videotape deposition of Dr. Katz. In consideration of all of the above, the court finds that Educators' decision was not based on any sound judgment but appears to have been motivated by a desire not to pay the claim.

First, with regard to the psychological evaluation performed by Louis Poloni Ph.D., this court fails to understand how Educators could conclude that a non-medical psychologist is qualified to determine whether a patient is physically disabled. At best, a competent psycholo-

---

1. The court has reviewed all of the records that were available to Mr. Wasnock. Contrary to his contentions, these records do not indicate that Mr. Kerper is disabled because of a "psychological overlay."

gist can determine only whether someone is suffering from a mental ailment. Notwithstanding this inherent flaw in Educators' reasoning, Dr. Poloni concluded that Mr. Kerper's evaluation suggested that he "has a pain disorder associated with psychological factors *and a medical condition . . . .*" (emphasis added) (See defendant's exhibit no. 9.) Therefore, even the defendant's expert did not rule out a medical condition as the root cause of Mr. Kerper's disability.

Moreover, the mere fact that an individual suffers from both a physical disability and a mental illness does not preclude a finding that that person is physically disabled. Indeed, almost everyone who becomes physically disabled as a result of a traumatic injury will have to cope with concurrent mental health issues. Thus, while the 24-month mental illness limitation set forth in the policy would apply in a situation where an otherwise healthy insured suddenly develops a mental illness (*e.g.,* schizophrenia), it does not apply in a case where a person suffers physical trauma and then *might* also have some degree of mental health problems. Therefore, Educators erred in basing their decision in whole or in part on Dr. Poloni's report.

As for the record reviews performed by Dr. Korevaar and US Medical Review, both of these reviews are biased to the point of being incredulous. For instance, Dr. Korevaar's conclusion that Mr. Kerper could be "gainfully employed" is based on, inter alia, the fact that he "has maintained a stable marital and family relationship." (See defendant's exhibit no. 11.) This was not a valid basis to conclude that Mr. Kerper is not disabled. In fact, taking Dr. Korevaar's reasoning to its logical conclusion,

Christopher Reeve was not disabled because he also had maintained a stable marital and family relationship after his accident. The testimony of Dr. Katz uses similar reasoning.[2]

Contrary to the narrow interpretation of all of the defendant's experts, the term "disability" is defined in the policy as follows:

" 'Disability' and 'disabled' mean that because of injury or sickness:

"(1) the totally disabled insured cannot perform each of the material duties of his regular occupation; or

"(2) the residually disabled insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

"(a) performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

"(b) earning currently at least 20 percent less per month than his indexed pre-disability earnings due to that same injury or sickness.

"For this definition of disability, the elimination period is a period of consecutive days of total and/or residual disability for which no benefit is payable." (Defendant's exhibit no. 5, p. 5. See also, defendant's exhibit no. 5, p.

---

2. Under cross-examination, Dr. Katz opined that even Stephen Hawking, the famous British theoretical physicist and author who is confined to a wheelchair and forced to use a computer-generated voice synthesizer to communicate, is not disabled because he writes books. (See defendant's exhibit no. 14, pp. 44-45.) Moreover, Dr. Katz also opined, contrary to Educators' position, that Mr. Kerper "does not appear to be mentally ill." *Id.* at 178.

36 (indicating that Mr. Kerper chose the above definition of disability when he applied for the policy).)

Words of a disability insurance policy must be reasonably interpreted and liberally construed in favor of the insured. *Safran v. Mutual Life Insurance Company of New York,* 210 Pa. Super. 408, 234 A.2d 1 (1967). While Educators could have acknowledged that Mr. Kerper is no longer able to perform the material duties of a partner in an accounting firm, such as Reinsel & Company, and while Educators could have relied on the numerous reports from the plaintiff's treating physicians, Educators instead chose to shirk its duty under the policy and chose instead to rely solely on opinions from its own hired experts. Therefore, defendant's claim that the court used the wrong standard of review in reaching its verdict is without merit because, under any legal standard (de novo, arbitrary and capricious, or heightened scrutiny/arbitrary and capricious), Educators had no right to terminate benefits.

Finally, Educators' claim that the court improperly considered the testimony of Dr. Gould is also meritless. Prior to trial, the defendant filed a motion in limine to preclude any testimony by Dr. Gould regarding the plaintiff's disability, arguing that the opinion was beyond the scope of any reports or discovery provided by plaintiff's counsel. Rule 4003.5(c) of the Pennsylvania Rules of Civil Procedure provides as follows:

"(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her

testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings." Pa.R.C.P. 4003.5 (c).

As plaintiff noted in his post-trial brief, the rule is intended to prevent surprise at trial. See *Boyce v. St. Paul Property and Liability Insurance Co.,* 421 Pa. Super. 582, 618 A.2d 962 (1992). In *Boyce,* the Superior Court allowed an expert to testify beyond the scope of his report because the adverse party knew well in advance of trial the nature of the testimony and had an ample opportunity to rebut it. Similarly, Dr. Gould's report clearly put defendant on notice of the nature and extent of his testimony. Thus, Educators certainly should have expected that the plaintiff was calling Dr. Gould as a witness to opine on the issue of whether or not Mr. Kerper is disabled. Moreover, this deposition took place five months prior to trial, giving the defendant ample opportunity to produce witnesses to rebut it. Clearly, there was no surprise. At any rate, the court was more impressed with, and chose to follow, Dr. Gould's overall analysis of Mr. Kerper's condition. In any event, the issue of disability was for the court to determine based on the evidence presented. Therefore, the court did not err in allowing Dr. Gould to testify in this proceeding.

Accordingly, for all the foregoing reasons, the instant appeal should be denied.